IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SIGNET MARITIME CORPORATION, § | |
| § | |
| Plaintiff, § | |
| v. § | CIVIL ACTION NO. 24-2904 |
| § | |
| INTERNATIONAL SHIPBREAKING § | |
| LIMITED, LLC, § | |
| § | |
| Defendant. § | |

**MEMORANDUM AND OPINION**

This dispute arises out of an alleged breach of a maritime contract for vessel towage. The plaintiff, Signet Maritime, is a marine transportation and logistics company. The defendant, International Shipbreaking, dismantles ships to obtain scrap metal that is then sold. International Shipbreaking hired Signet to tow a decommissioned aircraft carrier from the Navy yard in Philadelphia, Pennsylvania to International Shipbreaking's yard in Brownsville, Texas. The parties agreed that Signet would deliver the aircraft carrier, the JFK, to Brownsville between May 29, 2024, and June 5, 2024. On May 24, 2024, a Navy representative informed International Shipbreaking that because an active osprey nest had been found aboard the JFK, it could not be moved under the Migratory Bird Treaty Act, 16 U.S.C. § 703(a). International Shipbreaking emailed Signet that it was cancelling the tow "for the time being." Signet filed this suit, asserting that by canceling the tow, International Shipbreaking repudiated the parties' contract.

Signet argues that the contract between it and International Shipbreaking was a "hell or high water" contract that was "non cancellable" with "no termination allowed." Signet moves for summary judgment that International Shipbreaking may not avoid its contract obligation to pay

the lump sum under the contract of $1,835,970.00, plus interest since May 24, 2024, at the contract rate of 1.5% per month. (Docket Entry No. 13). International Shipbreaking filed a cross-motion, (Docket Entry No. 17).

Based on the motion and cross-motion, the summary judgment record, and the applicable law, the court denies the motion and cross-motion for summary judgment. (Docket Entry Nos. 13, 17).

I.   Background

The parties do not dispute the following facts. International Shipbreaking hired Signet to tow the JFK for a lump sum payment of $1,835,970.00. The parties' contract provided that the delivery window for the JFK was to be between May 29, 2024, to June 5, 2024, with a final departure date to be determined. After the parties finalized the towage agreement, Signet began to mobilize its tug, the Signet Warhorse II, to leave the Gulf Coast and travel towards the JFK in Philadelphia.

On May 23, 2023, a Navy representative informed International Shipbreaking that "[m]ovement of the ex-JFK or removal of the active Osprey nest without a Federal Depredation Permit would be considered a violation of 16 United States Code 703(a)...." The Navy representative informed International Shipbreaking that "[the Naval Inactive Ships Maintenance Office's] options for movement of the ex-JFK are below: Pursue a Federal Depredation Permit … which takes approximately 3-6 months [or] … Wait for the Osprey to migrate in September/October timeframe." (Docket Entry No. 13-3 at 3). After receiving this email from the Navy, International Shipbreaking informed Signet that the Navy had found an Osprey nest on the JFK; International Shipbreaking had been informed that "by law" it could not move the JFK

with an active nest on board; and "[t]he tow of the ex-John F. Kennedy has been canceled for the time being. Probably until October." (Docket Entry No. 13-4).

In September 2024, the Navy informed International Shipbreaking that the ospreys were no longer present and the JFK could be towed. International Shipbreaking approached Signet to re-visit the possibility of Signet towing the ship, but ultimately, International Shipbreaking contracted with another transport company to tow the ship. This litigation followed.

## II.   The Legal Standard

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting FED. R. CIV. P. 56(a)). "A fact is material if it 'might affect the outcome of the suit.'" *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019), *as revised* (Jan. 25, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). When considering a motion for summary judgment, the court "must consider all facts and evidence in the light most favorable to the nonmoving party" and "must draw all reasonable inferences in favor of the nonmoving party." *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and pointing to record evidence demonstrating that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* FED. R. CIV. P. 56(c). "When 'the non-movant bears the burden of proof at trial,' a party moving for summary judgment 'may merely point to the absence of evidence and thereby shift to the non-movant the

3

burden of demonstrating by competent summary judgment proof that there is a dispute of material fact warranting trial.'" *MDK S.R.L. v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (alteration adopted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).

"Once the moving party has initially shown that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with specific facts showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (quotation marks and quoting reference omitted). "[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021) (quotation marks and quoting reference omitted). Rather, the nonmovant "must identify specific evidence in the record and articulate the precise manner in which that evidence supports [its] claim." *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (alteration adopted) (quotation marks and quoting reference omitted).

The movant is entitled to judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. But "[i]f 'reasonable minds could differ' on 'the import of the evidence,' a court must deny the motion." *Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Anderson*, 477 U.S. at 250–51).

### III.  Analysis

"The essential elements of a breach of contract action under both Texas and maritime law are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result

4

of the breach." *M/T King Dorian Tankschiffahrts Gmbh & Co. v. Anchor Marine & Indus. Supply*, 2018 U.S. Dist. LEXIS 226521, at *9 (S.D. Tex. Nov. 30, 2018) (citing *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007).

Neither Signet nor International Shipbreaking disputes the existence of a valid contract, or that Signet began to perform under the contract by mobilizing its tug to tow the JFK. Signet argues that there is also no dispute that International Shipbreaking breached the contract, which was "non-cancellable" with "no termination allowed" by cancelling the tow on May 24, 2024. (Docket Entry No. 13 at 6). According to Signet, while the presence of the osprey nest temporarily precluded performance under the contract, International Shipbreaking could still have upheld its end of the bargain by "confirming that [International Shipbreaking] would like to move forward with using Signet for the towage when [Signet's] designated vessel, the WARHORSE II, was available to perform after the birds left." (Docket Entry No. 18 at 4). Signet asserts that by "cancelling [the contract] in its entirety" when it became clear that the tow could not occur for several months, International Shipbreaking breached the parties' contract. (*Id.*). Signet argues that any subsequent discussions between it and International Shipbreaking "have no impact on Signet's ability to recover against ISL." (*Id.* at 4-5). And Signet asserts that its damages should be measured by the amount that it would have obtained had the contract been performed as contemplated: $1,835,970, plus accumulating interest since May 24, 2024. (*Id.* at 8).

International Shipbreaking argues that it never took ownership of the JFK but merely acted as a contractor for the Navy to tow and dismantle the JFK. (Docket Entry No. 17 at 2). According to International Shipbreaking, "[t]he Navy controlled and directed [International Shipbreaking's] work under the contract, and [International Shipbreaking] had to defer to [the Navy's] instructions and decisions. …" (*Id.*). As a result, International Shipbreaking "was precluded from taking any

5

actions that could contravene or otherwise infringe on the Navy's control of the vessel." (*Id*.). International Shipbreaking also argues that it did not "repudiate" the contract on May 24, but only cancelled it "for the time being"—the time that the active osprey nest on board the JFK made its towing illegal. (*Id.* at 7). International Shipbreaking points to the fact that once the ospreys had migrated, International Shipbreaking approached Signet to tow the vessel, but Signet was no longer able to perform the contract with a single tug, as the parties had agreed. (*Id*. at 8). The contract provided that Signet could substitute multiple tugs for a single tug, if the Navy approved the substitution of two tugs for one tug. (*Id*.). International Shipbreaking argues the Navy's refusal to consent to the two-tug proposal left International Shipbreaking no choice but to find another contractor to tow the JFK. (*Id*.). Finally, International Shipbreaking argues that even if it breached the contract by suspending performance until it was no longer illegal, Signet was not entitled to recover lost profits or consequential damages. (*Id*.). Because International Shipbreaking ultimately had to contract with another tower for over double the price that it agreed to with Signet, International Shipbreaking argues that it is entitled to damages. (*Id*.).

The court finds that there are genuine factual disputes that preclude granting summary judgment to either party on whether Signet is entitled to the damages it seeks. First, the record reflects a factual dispute as to whether International Shipbreaking did, in fact, unequivocally cancel the contract on May 24, 2024. International Shipbreaking points to its May 24, 2024, email stating that performance under the contract was cancelled "for the time being," as evidence that it did not "cancel" or "terminate" the contract; rather, the contract was terminated as a matter of law when performance became impracticable and illegal. (Docket Entry No. 17 at 10-11). By contrast, Signet points to International Shipbreaking's interrogatory response, which states that "subject to and without waiving said objection, ISL maintains that the TOWCON was cancelled on May 24,

2024, by the U.S. Navy's directive, as a matter of law," to assert that on May 24, 2024, International Shipbreaking repudiated the contract in its entirety. (Docket Entry Nos. 13-2 at 6-7, 18 at 9). Whether International Shipbreaking repudiated the contract on May 24, 2024, making the subsequent events—including Signet and International Shipbreaking's later negotiations over towing the JFK in September 2024—irrelevant is a question for a jury. Similarly, the record reflects a dispute as to whether, in September 2024, Signet could have reasonably arranged for another tug to complete the JFK tow and tender performance under the contract once the WARHORSE II was unavailable. (*See* Docket Entry No. 17 at 12; Docket Entry No. 18 at 9-10). If Signet could have chartered another tug to tow the JFK after the Navy rejected the two-tug proposal, as International Shipbreaking asserts, Signet could have mitigated its damages. Alternatively, Signet may have been able to tender performance and earn the contract price, despite the delay in performance due to the osprey nest, defeating a claim of breach by International Shipbreaking. Despite the limited record and straightforward facts, the record reflects disputes of material fact necessary to determining whether Signet has met the key elements of its breach of contract claim.

### IV.   Conclusion

The court denies the motion for summary judgment, (Docket Entry No. 13), and the cross-motion, (Docket Entry No. 17).

SIGNED on May 20, 2025, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge