United States District Court
Southern District of Texas
**ENTERED**
March 07, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| SIGNET MARITIME CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. 24-2904 |
| | § | |
| INTERNATIONAL SHIPBREAKING | § | |
| LIMITED, LLC, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

This dispute arises out of a maritime contract for vessel towage. The plaintiff, Signet Maritime, is a marine transportation and logistics company. The defendant, International Shipbreaking, dismantles ships to obtain scrap metal that it then sells. International Shipbreaking hired Signet to tow the *JFK*, a decommissioned aircraft carrier from the Navy yard in Philadelphia, Pennsylvania to International Shipbreaking's yard in Brownsville, Texas. The parties agreed that Signet would deliver the *JFK* to Brownsville between May 29, 2024, and June 5, 2024. On May 24, 2024, a Navy representative informed International Shipbreaking that because an active osprey nest had been found on the main mast of the *JFK*, the Migratory Bird Treaty Act, 16 U.S.C. § 703(a), applied and prevented the *JFK* from sailing. International Shipbreaking emailed Signet that it was cancelling the tow "for the time being." Signet alleges that International Shipbreaking later made the tow cancellation permanent. Signet sued, alleging that by canceling the tow, International Shipbreaking repudiated the parties' contract. Signet argues that its contract with International Shipbreaking was a "hell or high water" contract that was "non cancellable" with "no termination allowed." Signet moves for summary judgment on liability, arguing that International

Shipbreaking may not avoid its contract obligation to pay the lump sum due under the contract of $1,835,970, plus interest since May 24, 2024, at the contract rate of 1.5% per month. (Docket Entry No. 21). International Shipbreaking filed a cross-motion on liability, (Docket Entry No. 23), and a separate motion for summary judgment on damages, arguing that Signet is not entitled to recover any profits it expected to make on the voyage, (Docket Entry No. 28). Signet responded with a cross-motion, arguing that it is entitled to the full lump sum of $1,835,970, plus interest, or, in the alternative, to establish its benefit-of-the-bargain damages under the common law. (Docket Entry No. 29).

Based on the motions and cross-motions, the summary judgment record, and the applicable law, the court denies both Signet's renewed motion for partial summary judgment on liability, (Docket Entry No. 21), and International Shipbreaking's cross-motion, (Docket Entry No. 23); and denies both International Shipbreaking's motion for partial summary judgment on damages, (Docket Entry No. 28), and Signet's cross-motion, (Docket Entry No. 29). Yet more factual development and clarification is required before judgment may be entered as a matter of law.

## I.      Background

International Shipbreaking hired Signet to tow the *JFK* for a lump-sum payment of $1,835,970. The parties' contract provided for a delivery window was between May 29, 2024, to June 5, 2024, with a final departure date to be determined. After the parties finalized the towage contract, Signet began to mobilize its tug, the *Signet Warhorse II*, to leave the Gulf Coast and travel to Philadelphia.

On May 24, 2024, a representative of the United States Navy emailed Chris Green and Robert Berry of International Shipbreaking, informing them that "NAVFAC Environmental positively identified an active Osprey nest on the main mast of the ex-JFK." (Docket Entry No.

23-1 at 15).  The email informed International Shipbreaking that "[m]ovement of the ex-JFK or removal of the active Osprey nest without a Federal Depredation Permit would be considered a violation of 16 United States Code 703(a)."  (*Id.*).  The Navy representative presented International Shipbreaking with two options: (1) "Pursue a Federal Depredation Permit"; or (2) "Wait for the Osprey to migrate in September/October timeframe."  (*Id.* at 15–16).

Later that day, Berry emailed Joseph Sanna of Signet, stating that:

> [u]nfortunately, the Navy found an Osprey nest on the JFK. The State inspected and determined it [to] be an active nest. I have been informed that by law we cannot move the ship with an active nest on board. The tow of the ex-John F Kennedy has been cancelled for the time being. Probably until October.

(Docket Entry No. 13-4 at 2).

Sanna responded with proposals for alternative arrangements, including adjusting the dates for towing the *JFK* and changing the payment terms:

> Thank you for your email, and thank you for speaking with Mr. Snyder and I a moment ago. We understand this matter will cause a severe delay to the tow, SIGNET WARHORSE II has been halted at Pascagoula, Mississippi. We are prepared to adjust the start window to October/November, with consideration for our existing work in towing the SALAMANCA Rig from Brownsville to Ingleside (expected to take place in September/October). We propose International Shipbreaking provide compensation for half of the expected duration of the charter for hire only -no fuel, no lubes- for a total of $540,000 (Daily charter hire $45,000 x 50% x 25 days expected total voyage duration including mob/demob = $540,000) dependent on keeping the existing charter in place as we want to do this job for you. Because we had to pass on other jobs, we feel this is a fair ask, and as always we are available to discuss with you at your convenience.

(Docket Entry No. 23-1 at 2).

On May 28, 2024, Green responded to Sanna's proposal, attaching an email that explained International Shipbreaking's position.  (Docket Entry No. 23-1 at 6).  The attachment explained that International Shipbreaking could not accept Signet's proposal because the government order

3

based on the osprey nest preventing the tow automatically terminated the towing contract and because Clause 22(c) of the contract precluded recovery of consequential damages:

> We refer to your email of May 24th and write to advise you that we can not accept Signet's proposed compensation in light of the circumstances described in our email to you of the same date. The order issued by the U.S. Government on May 24, 2024, was a mandate which prohibited any movement of the vessel for an unspecified and indefinite period of time until the order is rescinded. This governmental order was an unforeseeable event which prevents the contract from being performed for reasons entirely beyond the control of ISL. We are advised by counsel that this event had the effect of automatically terminating the towing contract as a matter of law under the common law legal doctrines of frustration, impossibility, and force majeure, all of which apply to the towing contract under maritime law.
>
> In addition, we note that Clause 22(c) expressly excludes the recovery of any type of consequential damages by either party. In the circumstances, if any recovery were to be allowed notwithstanding the foregoing, it would be limited to Signet's actual out-of-pocket costs incurred.
>
> Please contact me if you wish to discuss.

(Docket Entry No. 21-1 at 2).

On May 29, 2024, Sanna responded to Green's email, attaching a letter on Signet's behalf. (Docket Entry No. 23-1 at 5). This letter is not in the summary judgment record. The next day, May 30, Sanna again emailed International Shipbreaking, attaching an invoice for the delay in moving the vessel and proposing terms to keep the contract in place, given the delay. The email stated:

> Good morning. Please find attached invoice for delay of the contract as proposed in my letter sent to you yesterday at 17:30 CDT. As proposed, Signet will accept this payment as compensation for delaying the project window until a date to be agreed between both parties. We require payment confirmation by our bank by 1600 tomorrow, else the proposal is rescinded and Signet will seek compensation in the full amount of the contract value, $1,835,970. We remain available to discuss this afternoon. Thank you.

(*Id.*).  The invoice attached to Signet's email referred to a delay payment and asserted that International Shipbreaking had anticipatorily repudiated the parties' contract.  (Docket Entry No. 23-1 at 10).  The invoice included the following description of the $540,000 charge:

> To invoice for Ex-JOHN F KENNEDY delay payment for adjustment to delivery window to a date to be mutually agreed, due by 1600 May 30, 2024. If payment is not received within 24 hours of the due date, Signet will rescind the offer to allow for delay payment, and instead invoice for the entire amount of $1,835,970 for anticipatory breach of contract, due 1700 May 31, 2024.

(*Id.*).

The next day, Green and Sanna held a teleconference to discuss the osprey situation.  (*Id.* at 12–13).  After the call, Sanna emailed Green, reiterating that Signet would accept payment to delay the start date and keep the contract in place:

> Thank you for speaking to Mr. Snyder and I this afternoon. As discussed in our call, Signet will accept payment of $900,000, due upon receipt, to compensate for the delayed start date for towage of the JFK. As discussed and tentatively agreed in our call, 80% of the $900,000 shall be applied to the invoice to be issued for the tow when the project resumes and Signet issues the final invoice in the total amount agreed in the executed SIMCO Towcon. Please find attached invoice revised to reflect the aforementioned agreement. Thank you, we remain available to address any questions.

(*Id.* at 12).  Signet issued an invoice reflecting these terms.  (*Id.*).

In September 2024, Signet submitted a proposal to Green to tow the *JFK* using two tug boats.  (*Id.* at 20).  Signet made the proposal "without prejudice to the rights and claims of Signet Maritime Corporation."  (*Id.*).  The proposal included "estimated cost[s] . . . and fuel costs based on a tow route with average tow speed of 5 knots."  (*Id.*).  Signet warned that the stated costs were "estimates, subject to tug spread requirements as identified by local pilots, harbor masters, and other relevant parties."  (*Id.*).  Signet explained that it has "tow gear that [it] expect[s] [to] meet[] [the] necessary requirements to perform the tow, but will require further verification of connection

points on the tow." (*Id.*). The proposal concluded by thanking Green "for the opportunity to support International Shipbreaking." (*Id.*).

There are two motions for summary judgment and two cross-motions: (1) Signet's motion for summary judgment on liability, (*see* Docket Entry Nos. 21, 23); and (2) International Shipbreaking's motion for summary judgment on damages, (*see* Docket Entry Nos. 28, 29). All the motions are addressed below.

## II.    The Legal Standard

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting FED. R. CIV. P. 56(a)). "A fact is material if it 'might affect the outcome of the suit.'" *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019), *as revised* (Jan. 25, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). When considering a motion for summary judgment, the court "must consider all facts and evidence in the light most favorable to the nonmoving party" and "must draw all reasonable inferences in favor of the nonmoving party." *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and pointing to record evidence demonstrating that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* FED. R. CIV. P. 56(c). "When 'the non-movant bears the burden of proof at trial,' a party moving for summary judgment 'may merely point to the absence of evidence and thereby shift to the non-movant the

burden of demonstrating by competent summary judgment proof that there is a dispute of material fact warranting trial.'" *MDK S.R.L. v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (alteration adopted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).

"Once the moving party has initially shown that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with specific facts showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (quotation marks and quoting reference omitted). "[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021) (quotation marks and quoting reference omitted). Rather, the nonmovant "must identify specific evidence in the record and articulate the precise manner in which that evidence supports [its] claim." *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (alteration adopted) (quotation marks and quoting reference omitted).

The movant is entitled to judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. But "[i]f 'reasonable minds could differ' on 'the import of the evidence,' a court must deny the motion." *Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Anderson*, 477 U.S. at 250–51).

## III.    Analysis

### A.    Liability

In a maritime contract dispute, the court applies the general principles of contract law in force in most states. *Jackson v. Royal Caribbean Cruises, Ltd.*, 389 F. Supp. 3d 431, 446 (N.D.

Tex. 2019).  Federal courts may look to Texas law for guidance so long as it does not conflict with maritime law.  *Borden v. Amoco Coastwise Trading Co.*, 985 F. Supp. 692, 696 (S.D. Tex. 1997); *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 459 & n.4 (5th Cir. 1995).  "The core principles of Texas contract law are consistent with the general maritime law with respect to" most breach-of-contract claims.  *Oceaneering Int'l, Inc. v. Cross Logistics, Inc.*, No. CIV.A. H-11-3447, 2014 WL 2462810, at \*29 (S.D. Tex. June 2, 2014).  To prevail on a breach-of-contract claim, a plaintiff must prove: (1) a valid, enforceable contract; (2) that the plaintiff performed, tendered performance of, or was excused from performing its contractual obligations; (3) that the defendant breached the contract; and (4) that the defendant's breach caused the plaintiff injury.  *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007); *Wincheck v. American Express Travel Related Servs. Co.*, 232 S.W.3d 197, 202 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *Prime Products, Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied)); *accord Cent. Boat Rentals, Inc. v. Pontchartrain Partners, LLC*, 744 F. Supp. 3d 635, 639 (E.D. La. 2024) (discussing maritime contract principles).

"One such excuse for performing contractual obligations is the other party's breach of contract."  *Koonce v. Barclays Cap. Real Est. Inc.*, No. 01-10-00194-CV, 2011 WL 13385435, at \*6 (Tex. App.—Houston [1st Dist.] Dec. 22, 2011, no pet.) (mem. op); *see BFI Waste Sys. of N. Am. v. N. Alamo Water Supply Corp.*, 251 S.W.3d 30, 30–31 (Tex. 2008) (per curiam) (explaining that a material breach discharges the other's duty to perform).  This case involves an anticipatory breach.  "Repudiation or anticipatory breach is a positive and unconditional refusal to perform the contract in the future, expressed either before performance is due or after partial performance."  *CMA-CGM (Am.), Inc. v. Empire Truck Lines, Inc.*, 416 S.W.3d 495, 519 (Tex. App.—Houston [1st Dist.] 2013, pet. denied); *accord* RESTATEMENT (SECOND) OF CONTRACTS § 250(a) (Am L.

Inst. 1981).  "[T]o prevail on a claim for anticipatory breach, a plaintiff must establish each of the following elements: (1) an absolute repudiation of the obligation; (2) a lack of a just excuse for the repudiation; and (3) damage to the non-repudiating party."  *Gonzalez v. Denning*, 394 F.3d 388, 394 (5th Cir. 2004) (citing *Taylor Publ'g Co. v. Sys. Mktg., Inc.*, 686 S.W.2d 213, 217 (Tex. App.—Dallas 1984, writ ref'd n.r.e.)).

The parties dispute the first element: whether International Shipbreaking absolutely repudiated the towing contract.  An absolute contract repudiation "may consist of either words or actions by a party to that contract that indicate an intention that he or she is not going to perform the contract according to its terms."  *Narvaez v. Wilshire Credit Corp.*, 757 F. Supp. 2d 621, 631 (N.D. Tex. 2010) (citing *Builders Sand, Inc. v. Turtur*, 678 S.W.2d 115, 120 (Tex. App.—Houston [14th Dist.] 1984, no writ)).  The "declaration of intent to abandon must be in positive and unconditional terms."  *Preston v. Love*, 240 S.W.2d 486, 487 (Tex. Civ. App.—Austin 1951, no writ); *see Penthol, L.L.C. v. Vertex Energy Operating, L.L.C.*, 149 F.4th 504, 510 (5th Cir. 2025) (stressing that the repudiation must be unconditional).

The record shows that International Shipbreaking repudiated the contract. When it discovered the osprey nest, International Shipbreaking at first stated that the contract to deliver the *JFK* "has been cancelled for the time being.  Probably until October."  (Docket Entry No. 23-1 at 7).  After Signet asked for compensation for the delay, (*id.* at 6–7), International Shipbreaking made its cancellation unequivocal, stating that: (1) contract performance was impossible because of the government order preventing the ship from moving while the ospreys nested in the main mast; (2) the government "order was an unforeseeable event which prevents the contract from being performed for reasons entirely beyond the control of ISL"; and (3) the government order "had the effect of automatically terminating the towing contract as a matter of law." (Docket Entry

No. 21-1 at 2).   International Shipbreaking's statement that the government order prevented contract performance and therefore automatically terminated the contract was an unequivocal repudiation of the contract. *Cf. Sci. Mach. & Welding, Inc. v. FlashParking, Inc.*, 641 S.W.3d 454, 464 (Tex. App.—Austin 2021, pet. denied) (explaining that an overt act that "renders performance impossible" constitutes a repudiation).

International Shipbreaking argues that it did not repudiate the contract because its emails stressed that the government order halting the ship's movement was temporary (lasting until the ospreys moved on and the government lifted its order) and because Signet continued to state that it would perform at a later date.  (Docket Entry No. 23 at 4–6).  But this argument does not account for the facts that International Shipbreaking emphasized the "unspecified and indefinite" nature of the delay and used the unequivocal words "automatic termination" to describe the contract status. These statements compel the finding that International Shipbreaking viewed the towing contract as "terminated" and no longer in effect.

Signet's statements that the contract could be performed at some later date does not undermine finding that International Shipbreaking repudiated the contract.  The "injured party does not change the effect of a repudiation by urging the repudiator to perform in spite of his repudiation or to retract his repudiation."  RESTATEMENT (SECOND) OF CONTRACTS § 257.  In addition, Signet stated at the time that International Shipbreaking had anticipatorily breached the contract.  (*See* Docket Entry No. 23-1 at 10).  The record shows that International Shipbreaking repudiated the contract.

One problem with Signet's ability to prevail on its anticipatory-breach claim is that it elected that remedy too late. "An anticipatory repudiation of the contract gives the nonrepudiating party the option to treat the repudiation as a breach, or ignore it and await the agreed upon time of

10

performance." *Koonce*, 2011 WL 13385435, at *6 (citing *Bumb v. Intercomp Technologies, L.L.C.*, 64 S.W.3d 123, 124 (Tex. App.—Houston [14th Dist.] 2001, no pet.)). "If a party chooses to file suit after the time for performance of the contract, he elects to ignore the anticipatory repudiation." *Id.*; *see Bump*, 64 S.W.3d at 125 ("By choosing to file suit after the time for performance of the contract, Bumb elected to ignore the anticipatory repudiation." (citing *Lufkin Nursing Home, Inc. v. Colonial Inv. Corp.*, 491 S.W.2d 459, 463 (Tex. Civ. App.—Amarillo 1973, no writ)); *Fredonia Broad. Corp. v. RCA Corp.*, 481 F.2d 781, 801–02 (5th Cir. 1973) ("When the aggrieved party" chooses "not to sue for the anticipatory repudiation, . . . the contract remains in existence."); *Franconia Assocs. v. United States*, 536 U.S. 129, 142 (2002) ("Such a repudiation ripens into a breach prior to the time for performance only if the promisee 'elects to treat it as such.'" (quoting *Roehm v. Horst*, 178 U.S. 1, 13 (1900))). "Under this option, the nonrepudiating party must continue to comply with the contract." *Bump*, 64 S.W.3d at 125. The nonrepudiating party "remains subject to all his own obligations and liabilities under it, and enables the other party not only to complete the contract, if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstances which would justify him in declining to complete it." *Id.* (quoting *Pollack v. Pollack*, 39 S.W.2d 853, 857 (Tex. Com. App. 1931, holding approved)); *accord Roehm*, 178 U.S. at 11 (reciting the same rule); *see also Denison Mines, Ltd. v. Michigan Chem. Corp.*, 469 F.2d 1301, 1307 n.12 (7th Cir. 1972) (same); *Canderm Pharmacal, Ltd. v. Elder Pharms., Inc.*, 862 F.2d 597, 603–04 (6th Cir. 1988) (same).

The contract specified the date of performance as May 29, 2024. Signet did not file this lawsuit until August 5, 2024. (Docket Entry No. 1).[1] Signet cannot claim anticipatory repudiation

---

[1] To the extent the date of performance is September 2024, when the ospreys departed and the impossibility ended, (Docket Entry No. 17-3), the relevant issues would not change even though Signet could sue for anticipatory repudiation. Whether Signet could have performed under the contract in September 2024 is

11

and must instead prevail under traditional contract breach principles. *See Koonce*, 2011 WL 13385435, at *6; *Bump*, 64 S.W.3d at 125; *Pollack*, 39 S.W.2d at 857; *Roehm*, 178 U.S. at 11. Signet must prove that it performed, tendered performance of, or was excused from performing and that International Shipbreaking breached the contract. *See Wincheck*, 232 S.W.3d at 202. The parties' emails in the summary judgment record support finding that both parties wanted to perform under their contract in May 2024 but could not do so because of the osprey nest and government order. These circumstances made it impossible for the parties to perform as the contract required. *See* RESTATEMENT (SECOND) OF CONTRACTS § 264 ("If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made."); *see also Tractebel Energy Mktg., Inc. v. E.I. du Pont de Nemours & Co.*, 118 S.W.3d 60, 64–65 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

But material questions remain. First, impossibility or impracticability defenses may not apply if the parties' contract assigned those risks to a specific party. *See Chevron Phillips Chem. Co. LP v. Kingwood Crossroads, L.P.*, 346 S.W.3d 37, 52 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (emphasizing that the impossibility defense applies "unless the language . . . indicate[s] the contrary" (quoting RESTATEMENT (SECOND) OF CONTRACTS § 261)); *see also Robberson Steel, Inc. v. J.D. Abrams, Inc.*, 582 S.W.2d 558, 561 (Tex. Civ. App.—El Paso 1979, no writ) ("[I]f the contract, properly construed, shows that the promisor assumed the risk of

---

still at issue because "[a] party's duty to pay damages for total breach by repudiation is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise." RESTATEMENT (SECOND) OF CONTRACTS § 254; *see* 13 WILLISTON ON CONTRACTS § 39:41 (4th ed. May 2025) ("[W]hile an anticipatory repudiation generally releases the nonbreaching party from any duty to perform, the repudiation does not relieve the nonbreaching party from showing an ability to perform in order to obtain a remedy.").

unanticipated events, the occurrence of such events does not excuse performance." (quoting *W. Los Angeles Inst. for Cancer Research v. Mayer*, 366 F.2d 220 (9th Cir. 1966))).  The parties dispute whether their contract assigned the risk of the impossibility they faced to International Shipbreaking.  Signet argues that because the contract was non-cancellable and did not allow for termination, International Shipping assumed the risk of an impossibility of performance.  (Docket Entry No. 13 at 2–3).  International Shipbreaking disputes this point.  (Docket Entry No. 26 at 3–4).

It is unclear that the terms "non-cancelable" or "no termination allowed" were "hell or high water" clauses that assigned the risk of a government order preventing timely performance to International Shipbreaking.  The fact that International Shipbreaking could not cancel the contract under circumstances other than a government order preventing performance does not mean that International Shipbreaking lacked a legal excuse for nonperformance under the circumstances here.  Commercial contracts and the UCC distinguish between terminations, cancellations, and excuses.  *See, e.g.*, *Ifone Neda Internet Serv. v. Army & Air Force Exch. Serv.*, No. 4:21-CV-330, 2022 WL 16577305, at *2 (S.D. Tex. Nov. 1, 2022) ("The contract contains a termination clause and a business risk clause."); U.C.C. § 2A-407(2)(b) (explaining that an irrevocable promise "is not subject to cancellation, termination," or "excuse").  These issues, as well as others related to the assumption of risk, were not squarely presented on these cross-motions and not adequately developed in the last round of cross-motions.

The defenses also do not apply if one party was at "fault" for the impossibility. RESTATEMENT (SECOND) OF CONTRACTS § 261.  Such "'fault' may include not only 'willful' wrongs, but such other types of conduct as that amounting to breach of contract or to negligence." *Id.* § 261 cmt. d.  The parties dispute whether International Shipbreaking, by allowing the ospreys

13

to nest, failed to substantially perform its obligation to make the *JFK* fit for towage.  (*See* Docket Entry No. 24 at 3–4; Docket Entry No. 26 at 3–4).  The summary judgment record does not include evidence on this question of fault, and the issue was presented only briefly in the parties' motions. (*See* Docket Entry No. 26 at 3 (raising the question whether International Shipbreaking exercised due diligence in ensuring that the tow could commence, in accordance with Clause 11(a), without offering substantiating evidence)).

Second, whether the temporary, if indefinite, impossibility of performance postponed rather than discharged the parties' contractual duties is insufficiently addressed in the present record.  Section 269 of the *Restatement (Second) of Contracts* states that "[i]mpracticability of performance or frustration of purpose that is only temporary suspends the obligor's duty to perform while the impracticability or frustration exists but does not discharge his duty or prevent it from arising unless his performance after the cessation of the impracticability or frustration would be materially more burdensome than had there been no impracticability or frustration."  This provision was often referred to in COVID-19 litigation.  Courts commonly ruled that the pandemic temporarily suspended, rather than discharged, contractual obligations, such as a tenant's obligation to pay rent.  *See, e.g.*, *Fitness Int'l, LLC v. City Ctr. Ventures, LLC*, 9 N.W.3d 526, 535 (Minn. 2024); *Le Fort Enters., Inc. v. Lantern 18, LLC*, 199 N.E.3d 1257, 1272–74 (Mass. 2023); *BB FIT, LP v. EREP Preston Trail II, LLC*, No. 05-22-00682-CV, 2023 WL 7401501, at *7 (Tex. App.—Dallas Nov. 9, 2023, no pet.).  The *Restatement* offers an illustration that is more apt to this case:

> On July 5, A charters his vessel to B for a voyage from New York to Liverpool, contracting that the vessel shall be ready for loading July 10.  On July 8, the government requisitions the vessel for the stated period of a week, returning the vessel to A in New York on July 15.  A's duty to have the vessel ready is suspended until July 15 and he is then under a duty to perform with an appropriate extension of time, unless B's duty to pay is then discharged by the delay under the rules stated

in §§ 237 and 267.  However, if circumstances including his other contracts then make it materially more burdensome for A to perform, A's duty is discharged regardless of whether B's duty would otherwise be discharged by the delay.

RESTATEMENT (SECOND) OF CONTRACTS § 269 illus. 2.  The government order in this case is similar to the requisition in the illustration.  The illustration identifies many of the relevant issues in this case.

The court must decide whether the parties' contractual duties were delayed or discharged. To enforce the contract, Signet must show that: International Shipbreaking refused to perform as the contract required; Signet tendered performance or its duty to perform was excused (because the delay made performance materially more burdensome) but it was ready, willing, and able to perform when the ospreys migrated and performance was again possible; and Signet can refute any showing by International Shipbreaking that its obligations were discharged under §§ 237 and 267 by the delay in Signet's performance.  *See Alexander O&G, LLC v. Nomad Land & Energy Res., LLC*, No. 16-2965, 2017 WL 3506863, at *4 (S.D. Tex. Aug. 16, 2017) ("Where tender of performance is excused, a party must plead and prove that he or she was ready, willing, and able to perform." (citing *Chessher v. McNabb*, 619 S.W.2d 420, 421 (Tex. Civ. App.—Houston [14th Dist.] 1981, no writ))).  The parties dispute these issues, (*See* Docket Entry No. 21 at 8; Docket Entry No. 23 at 6; Docket Entry No. 24 at 3–4; Docket Entry No. 26 at 4–5), but do so without sufficient attention to this legal framework.

These cross-motions for summary judgment, (Docket Entry Nos. 21, 23), are denied because the record before the court does not entitle either party to the relief each motion seeks. The parties may submit another round of summary judgment motions on these issues or agree to proceed to a bench trial before the court.

15

### B.      Damages

Under traditional contract principles, damages for a breach claim can be "direct or consequential." *Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*, 622 F. Supp. 3d 495, 518–19 (S.D. Tex. 2022) (Rosenthal, J.) (citing *Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC,* 576 S.W.3d 362, 373 (Tex. 2019)), *aff'd*, 117 F.4th 628 (5th Cir. 2024). "Direct damages often include restoration of the 'benefit of a plaintiff's bargain.'" *Signature Indus. Servs., LLC v. Int'l Paper Co.*, 638 S.W.3d 179, 186 (Tex. 2022) (quoting *Quigley v. Bennett*, 227 S.W.3d 51, 56 (Tex. 2007) (Brister, J., concurring)). Consequential damages compensate the plaintiff for foreseeable losses that were caused by the breach but were not a necessary consequence of that breach. *Id.* (citing *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998)).

"The normal measure of damages in a breach-of-contract case is the benefit-of-the-bargain measure, the purpose of which is to restore the injured party to the economic position it would have been in had the contract been performed." *Mays v. Pierce*, 203 S.W.3d 564, 577 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). "The correct standard for assessing loss of benefit of the bargain damages measures the difference between the value as represented and the value as received by the nonbreaching party." *Sacks v. Hall*, 481 S.W.3d 238, 247 (Tex. App.—Hous. [1st Dist.] 2015, pet. denied); *see DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 180 (Tex. App.—Fort Worth 2012, no pet.) ("One measure of direct damages is the 'benefit of the bargain' measure, which utilizes an expectancy theory and evaluates the difference between the value as represented and the value received."). "The benefit of the bargain is measured by the prevailing party's anticipated receipts and losses caused by the breach less any cost or other loss [it] has avoided by not having to perform." *Qaddura v. Indo-European Foods, Inc.*, 141 S.W.3d 882, 889 (Tex. App.—Dallas 2004, pet. denied).

Both parties argue that their contract abrogated the common law and supplied a different damages measure. Signet argues that Section 5 of the contract guarantees it the $1,835,970 value of the contract. (Docket Entry No. 29 at 1–2). International Shipbreaking argues that Section 22(c) of the contract limits Signet's recovery by precluding recovery of lost profits, including the profits that Signet anticipated from performing the towing contract. (Docket Entry No. 28 at 4–5). The court adopts neither position. The contract does not displace traditional benefit-of-the-bargain damages, and Section 22(c) limits typical consequential damages, which Signet is not seeking. If International Shipbreaking is liable for breaching the contract, then Signet is entitled to its benefit-of-the bargain damages, which is the $1,835,970 value of the contract, less the costs avoided by nonperformance and profits earned through mitigation efforts.

### 1. Section 5 of the Towing Contract

Signet argues that Section 5 of the contract entitles it to the full lump-sum payment, not benefit-of-the-bargain damages. Section 5 provides:

> The Lump Sum and all other sums payable to the Tugowner under this Agreement shall be payable without any discount, deduction, set-off, lien, claim or counterclaim, each instalment of the Lump Sum shall be fully and irrevocably earned at the moment it is due as set out in Box 22, Tug and/or Tow or part of Tow lost or not lost, and all other sums shall be fully and irrevocably earned on a daily basis as per Box 29.

(Docket Entry No. 28-1 § 5(c)). Box 22 provides that the first installment of $917,985 is "due and payable on arrival of Tug at the Place of Connection, the location of the Tow referenced in Box 20 Place of Departure." (*Id.* at 2). The second installment of $917,985 is "due and payable after arrival of Tug and Tow at Place of Destination and prior to release of the Tow." (*Id.*). Under the contract, the "Tow" is the *JFK* and the "Tug" is Signet's *Warhorse*. (*Id.* at 1). The "Place of Connection" is Philadelphia, Pennsylvania. (*Id.* at 2).

17

The Fifth Circuit has ruled on a similar contract provision. In *International Shipbreaking Ltd. LLC v. Smith*, 44 F. App'x 653 (5th Cir. 2002), the court considered a dispute arising out of the sinking of a naval destroyer during towage. That case involved an International Shipbreaking contract with the Navy to dismantle two decommissioned destroyers. *Id.* at *1. As part of its contract obligations, International Shipbreaking had to tow "both ships from Pearl Harbor, Hawaii to its facility in Brownsville, Texas." *Id.* International Shipbreaking contracted "with Smith Maritime . . . for towage of the destroyers from Pearl Harbor to Brownsville." *Id.* Two weeks into the tow, one of the destroyers started to fall apart. *Id.* After the Navy, International Shipbreaking, and Smith conferred, "Smith directed the tug's captain to order all hatches opened to allow" the collapsing destroyer "to sink." *Id.* Smith successfully delivered the other destroyer to International Shipbreaking in Brownsville. *Id.* International Shipbreaking "then filed suit against Smith for negligence in the towing of the destroyer and breach of the warranty of workmanlike service implied in the contract between" them. *Id.* Smith counterclaimed that International Shipbreaking "breached its contract with Smith due to its failure to pay the final installment due to Smith under the contract." *Id.*

The Fifth Circuit ruled that International Shipbreaking breached by failing to pay Smith. *Id.* at *4. The court held that "the fact that the [collapsing destroyer] sank before the completion of towage did not relieve [International Shipbreaking] of its obligation to pay the final installment to Smith." *Id.* "The parties contemplated the risk of loss of the tow" because the contract "expressly provided that payment was due 'without any discount, deduction, set-off, lien, claim or counterclaim . . . fully and irrevocably earned at the moment it is due . . . Tug and/or Tow lost or not lost.'" *Id.* (ellipses in original). "Because [International Shipbreaking] expressly bargained

18

for the undertaking and not the result, it was obligated to make its final payment on the contract regardless of the sinking of the" collapsing destroyer. *Id.*

Signet argues that because the contract between it and International Shipbreaking includes the same provision, Signet is entitled to receive the full lump-sum payment even though the tow could not be completed. (Docket Entry No. 29 at 2–6). The court disagrees. Signet argues that Section 5 of the contract is a liquidated-damages provision that abrogates common-law contractual remedies. But the contract's language does not support this reading. Section 5 provides that installments are due when certain conditions are fulfilled. Installment contracts may still be subject to adjustments based on the cost of performance or mitigation. *See Weichsel Farm Ltd., P'ship v. JPMorgan Chase Bank, Nat. Ass'n*, No. 3:09-CV-00672-L, 2012 WL 1033514, at *11 (N.D. Tex. Mar. 28, 2012) ("The proper of measure of damages for future rent is the rent payments that would have been paid under the lease, reduced to present value, and further reduced by the amount the landlord received or could have received through mitigation."), *aff'd*, 758 F.3d 592 (5th Cir. 2014). Although Section 5 has strong language—"without any discount, deduction, set-off, lien, claim or counterclaim" and "fully and irrevocably earned"—those clauses address the damages a counterparty might seek if there was a cross-breach. *See Bandy v. First State Bank, Overton*, 835 S.W.2d 609, 618 (Tex. 1992) ("If the setoff was allowed the amount that the plaintiff would recover from the defendant was reduced by the amount that the plaintiff owed the defendant."). Section 5 limits the counterclaims or discounts that International Shipping might seek if, for example, Signet had damaged or lost the *JFK* during the voyage. The contract terms do not exempt Signet from the usual calculation of expectation damages.

*Smith* is not to the contrary. In that case, the Fifth Circuit emphasized that one of the destroyers "was successfully towed by Smith to Brownsville, Texas." *Smith*, 44 F. App'x 653, at

19

*4 n.8. That meant Smith had fully performed and incurred the full cost of performance; the contract value was necessary to ensure that Smith obtained the benefit of the bargain it had earned. International Shipping argued that it should not pay the final instalment payment because it thought Smith was at fault for causing or allowing one of the destroyers to sink, but the contract directly addressed and precluded a claim for that alleged cross-breach. *Id.* at *4. Because the "payment was due 'without any discount, deduction, set-off, lien, claim or counterclaim. . . fully and irrevocably earned at the moment it is due . . . Tug and/or Tow lost or not lost,'" the "parties contemplated the risk of loss of the tow" and agreed that the sinking "did not relieve" International Shipping of its obligation to pay. *Id.* International Shipping "expressly bargained for the undertaking," which Smith performed. *Id.* By contrast, in this case, the undertaking never occurred because the government order made timely performance impossible. The risk of loss contemplated in Section 5—the risk of damage to a ship during voyage—is not the same type of risk that occurred in this case—the risk that the voyage would not begin when called for in the contract. *Smith* does not show that Signet is guaranteed the lump-sum payment it seeks.

For these reasons, Signet's motion for partial summary judgment that Section 5 of the contract entitles it to the $1,835,970 value of the contract, (Docket Entry No. 29), is denied.

### 2.　Section 22(c) of the Towing Contract

International Shipbreaking argues that Section 22(c) "expressly excludes recovery of certain losses arising out of or in connection with the performance or non-performance" of the contract. (Docket Entry No. 32 at 7). Section 22(c) provides:

> Excluded losses - Notwithstanding anything else contained In this Agreement (save for subclause 15(c)) neither party shall be liable to the other for any of the following, whether foreseeable or not at the time of execution:
>
> (i) any loss of use (including, without limitation, loss of use or the cost of use of property, equipment, materials and services including without limitation, those

provided by contractors or sub-contractors of any tier or by third parties), loss of profits or anticipated profits; loss of product; loss of business; business interruption; loss of or deferral of drilling rights; loss, restriction or forfeiture of licences, concession or field interest; loss of revenue, shut in, loss of production, deferral of production, increased cost of working; cost of insurance; or any other similar losses whether direct or indirect; and

(ii) any consequential or indirect loss whatsoever; arising out of or in connection with the performance or non-performance of this Agreement even if such loss Is caused wholly or partially by the act, neglect, breach of duty (whether statutory or otherwise) or default of the indemnified party, and even if such loss is caused wholly or partially by the unseaworthiness of any Tug, and the Tugowner shall indemnify, protect, defend and hold harmless the Hirer's Group from such losses suffered by the Tugowner's Group and the Hirer shall indemnify, protect, defend and hold harmless the Tugowner's Group from such losses suffered by the Hirer's Group.

(Docket Entry No. 28-1 § 22(c)).  International Shipbreaking relies on Section 22(c)'s reference to "loss of profits or anticipated profits" to argue against the benefit-of-the-bargain damages that Signet seeks.  (Docket Entry No. 32 at 4).  In International Shipbreaking's view, benefit-of-the-bargain damages are the profits that Signet anticipated from completing the voyage, which Section 22(c) does not permit it to recover.

The court disagrees with International Shipbreaking's reading of the contract.  The term "loss of profits," as used in Section 22(c), addresses a specific form of damages from a breach of contract.  In the business-service context, courts regularly award damages based on lost profits that a party anticipates making in a subsequent business arrangement that depends on contract performance.  *See Sweet Additions Ingredient Processors, LLC v. Meelunie Am., Inc.*, 139 F.4th 1217, 1230 (11th Cir. 2025) (per curiam) (first citing *Reid Hosp. & Health Care Servs., Inc. v. Conifer Revenue Cycle Sols., LLC*, 8 F.4th 642, 649 (7th Cir. 2021); and then citing  *Energy Cap. Corp. v. United States*, 302 F.3d 1314, 1328–29 (Fed. Cir. 2002)).  In *Sweet Additions*, for instance, Sweet Additions purchased tapioca starch from Meelunie; Meelunie's failure to deliver the starch to Sweet Additions allegedly caused it to lose profits from sales of the products in which that

21

tapioca starch would have been used. *See id.* at 1223, 1230. In *Energy Capital*, Energy Capital contracted with the Department of Housing and Urban Development under terms that would allow it to originate up to $200 million worth loans to third parties; the Department's breach of the contract prevented Energy Capital from issuing those loans and caused it to lose the profits that it anticipated making off of them. 302 F.3d at 1328–29. Or, imagine a hypothetical case more similar to this one in which a cruise line contracted with a company to tow a cruise ship to port to begin a voyage and a contract breach by the towing company prevented that voyage from occurring; the cruise line would then lose the profits it anticipated from that voyage. *Cf. Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1001 (5th Cir. 1984) (discussing the "time honored rule in maritime cases that a proper method of determining lost detention profits is to seek a fair average based on a number of voyages before and after"). Section 22(c) applies to a claim for loss of the profits that one of the contracting parties expected to earn in a subsequent business arrangement. Section 22(c)'s "loss of profits" does not apply to the payment obligation in the contract itself.

This reading of the "loss of profits" term fits the rest of Section 22(c). Section 22(c)(i) groups the "loss of profits" with "loss of use," "loss of product," "loss of business," "loss of production," and "increased cost of working." (Docket Entry No. 28-1 § 22(c)). These terms all refer to "prototypical incidental or consequential damage[s]." *Sweet Additions*, 139 F.4th at 1231 (discussing a list that included "loss of profits" with "loss of use of the product or any associated product, cost of capital, facilities, or service, downtime costs, and claims of the buyer's customers for damages"). These damages generally "do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably

foreseeable by the breaching party at the time of contracting." *Id.* at 1229 (quoting *Sullivan Indus., Inc. v. Double Seal Glass Co.*, 480 N.W.2d 623, 631 (Mich. App. 1991)). Because courts interpret terms in a list based on the words surrounding it, *Headington Royalty, Inc. v. Finley Res., Inc.*, 623 S.W.3d 480, 492 (Tex. App.—Dallas 2021), *aff'd*, 672 S.W.3d 332 (Tex. 2023), the term "loss of profits" in Section 22(c) is best read to refer to profits lost on secondary business arrangements, *see Reid Hosp.*, 8 F.4th at 649 (collecting examples of cases of lost-profit damages). No term in Section 22(c)(i) encompasses the damages that Signet seeks here, which follow from International Shipbreaking's payment obligations in the contract.

The fact that Section 22(c) bars recovery of both "direct" and "indirect" damages does not call for a different result. Profits lost from secondary business arrangements may be direct or indirect (or consequential) damages, depending on the context. *See Sweet Additions*, 139 F.4th at 1329–31; *Reid Hosp.*, 8 F.4th at 649. In *Energy Capital*, for instance, the court held that the lost profits were direct because the purpose of the contract was to enable Energy Capital to originate loans from which it would profit. 302 F.3d at 1328–29. And in *Penncro Associates, Inc. v. Sprint Spectrum, L.P.*, then-Judge Gorsuch held that lost profits were direct (and not consequential) when the breaching party promised to refer clients to a contract, failed to do so, and caused the contractor to miss business opportunities. 499 F.3d 1151, 1154–58 (10th Cir. 2007). Section 22(c) precludes all lost-profit damages, whether direct or indirect, avoiding such holdings as in *Sweet Additions*, 139 F.4th at 1329–31, *Penncro Associates*, 499 F.3d at 1154–58, and *Reid Hospital*, 8 F.4th at 649, where the courts held that the contract precluded recovery of indirect or consequential lost profits but permitted recovery of direct lost profits. But this clarification does not lead to International Shipbreaking's conclusion that Section 22(c) bars Signet from recovering the profits it anticipated from performing the tow. Section 22(c) does not support the conclusion that the

parties intended to prevent Signet from recovering the profits it expected from the contract payment for its performance.

"This interpretation is supported by consideration of the contract as a whole." *ROC-Houston, P.A. v. Parameswaran*, No. 01-22-00613-CV, 2024 WL 3762479, at \*9 (Tex. App.—Houston [1st Dist.] Aug. 13, 2024, no pet.) (mem. op.); *see Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument."). As Signet emphasizes, the contract provides that it is "[n]on-cancellable" and that "[n]o termination is allowed." (Docket Entry No. 28-1 at 3). These clauses, at a minimum, prevent International Shipbreaking from terminating the contract on its own. But if International Shipbreaking's reading of Section 22(c) were correct, then it could walk away from the contract with little or no penalty. *See Sweet Additions*, 139 F.4th at 1232–34 (disfavoring readings of limitations of liability that allow a party "walk away from" its contractual obligations). Although International Shipbreaking concedes that it would still owe Signet reliance damages (the expenses Signet "incurred in performing the contract prior to the cancellation"), (Docket Entry No. 28 at 5), these damages would be *de minimus* because Signet incurred minimal transportation costs before cancellation, (*see* Docket Entry No. 23-1 at 2 (noting that the *Warhorse* stopped in Mississippi after learning of the ospreys)). If Signet had not incurred costs, International Shipbreaking would owe nothing. International Shipbreaking reads into the contract a termination right that the language, (Docket Entry No. 28-1 at 3), plainly excludes. Because courts must read contracts based on "the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered

meaningless," *Coker*, 650 S.W.2d at 393 (emphasis omitted), the court cannot adopt International Shipbreaking's reading of Section 22(c).[2]

For these reasons, International Shipbreaking's motion for partial summary judgment, (Docket Entry No. 28), is denied.

### 3.     Common-Law Expectation Damages

In the alternative, Signet moves for partial summary judgment on the amount of common-law benefit-of-the-bargain damages it is entitled to recover if International Shipbreaking breached. (Docket Entry No. 29 at 6–10).  Expectation damages are measured by:

> (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus
>
> (b) any other loss, including incidental or consequential loss, caused by the breach, less
>
> (c) any cost or other loss that he has avoided by not having to perform.

RESTATEMENT (SECOND) OF CONTRACTS § 347.  This calculation awards the injured party the "sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed."  *Id.* cmt. a.  These damages "are not recoverable" to the extent that they "could have" been "avoided without undue risk, burden or humiliation" and that the injured party "has made reasonable . . . efforts to avoid loss."  *Id.* § 350(1)–(2).

---

[2] International Shipbreaking argues that the contract does not need to be harmonized because Section 22(c) applies "[n]otwithstanding anything else contained [i]n th[e] Agreement."  (Docket Entry No. 32 at 3–4 (quoting Docket Entry No. 28-1 § 22(c))).  International Shipbreaking is correct that this trumping language makes Section 22(c) control over conflicting provisions in the contract.  *See Assured Guar. Corp. v. Madison County*, 693 F. App'x 287, 292 (5th Cir. 2017) (per curiam).  But this principle does not mean the court should read "loss of profits" to create a conflict when "the plain language does not require it, much less suggest it."  *Sweet Additions*, 139 F.4th at 1232.  The fact that the parties agreed Section 22(c) would trump other rights in the contract suggests instead that "loss of profits" is not as capacious as International Shipbreaking makes it out to be.  Signet would not have agreed to such a hollow bar on International Shipbreaking's right to cancel the contract.  *See Penncro Assoc.*, 499 F.3d at 1157 ("[W]e are reluctant to shed ordinary meanings and presume unusual private ones without some clear indication that the parties wished us to do so.").

Signet's alternative damages proposal tracks Section 347:

(a) The contractual lump sum of $1,835,970, plus

(b) $0.00, because Signet is not claiming lost profit, or any other incidental or consequential damages, less

(c) the costs of fuel, lubes, etc., that were not used because the *Warhorse* was largely idle following the cancellation of the tow.

(Docket Entry No. 29 at 7–9). Signet argues that it is entitled to "no less than $995,750.00, plus interest." (Docket Entry No. 29 at 9). Signet bases this calculation on the day rate for the *Warhorse* and the value of the contract "when accounting for . . . unconsumed fuel, lubes, etc." (*Id.* at 8). The day rate is "$45,000.00 per day." (Docket Entry No. 29-2 ¶ 4). Signet charged International Shipping the day rate for 25 days, because Signet anticipated that it would depart from "Mississippi, on May 24, 2024, arrive in Philadelphia on May 31, 2024," "depart with the JFK from Philadelphia to ISL's yard in Brownsville, Texas, on June 1, 2024," reach "Brownsville with the JFK on June 16, 2024," and then return "back at its home port in Pascagoula on June 19, 202[4]." (*Id.* ¶ 3). Signet calculated the value of the contract less the avoided costs as $1,125,000. (Docket Entry No. 29 at 8). Signet reduced this total by the profit it made through a replacement contract, which was an 11-day voyage at the rate of $11,750 per day (or $129,250). (*See* Docket Entry No. 29-2 ¶ 5). Deducting the total day-rate value of the mitigation contract from that of the towing contract results in damages of $995,750.

Signet's damages calculation is a correct application of Section 347 and comports with the damages methodologies used in similar maritime cases. *See Kim Crest, S.A. v. M.V. Sverdlovsk*, 753 F. Supp. 642, 649 (S.D. Tex. 1990) (calculating damages based on "the ship's charter rate, less the variable or incremental expenses that would have been required of the owner to perform the charters"). Even so, this court cannot grant summary judgment at this stage of the proceeding.

26

"[M]otions for summary judgment in which a plaintiff is seeking to be awarded a specific sum of damages . . . tend to be ones which courts are most cautious in granting." *Aluminicaste Fundicion De Mexico v. Aluminum Extrusions, Inc.*, No. 3:16-CV-071-MPM-RP, 2017 WL 2561581, at *1 (N.D. Miss. June 13, 2017); *see Newsome v. State*, 922 S.W.2d 274, 281 (Tex. App.—Austin 1996, no writ) ("Summary judgment is therefore inappropriate in cases involving unliquidated damages."). Courts grant motions for partial summary judgment on damages when the plaintiff fails to substantiate its alleged damages after discovery or the court accepts the plaintiff's facts as true but holds that certain categories of the claimed damages are not recoverable. *See Paragon Asset Co. Ltd v. Gulf Copper & Mfg. Corp.*, No. 1:17-CV-00203, 2020 WL 1892953, at *1–2 (S.D. Tex. Feb. 11, 2020). Rarely do courts affirmatively determine damages at the summary judgment stage. As one court explained, if its "review of the facts suggested that [the] plaintiff was entitled to recover $1,700,000 instead of $1,700,062.53, then it would be improper to grant its motion for summary judgment." *Aluminicaste Fundicion*, 2017 WL 2561581, at *1. The finder of fact must make that precise determination on a full record.

Precision is one issue here. Some imprecision in the amount is acceptable, even after a trial on the merits; the law generally provides that the "amount of damages should be fixed by the fact-finder in the exercise of sound discretion when the damages cannot be calculated with mathematical certainty." *See State v. Buckner Const. Co.*, 704 S.W.2d 837, 844 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.); *see also id.* at 843–44 ("To prove such amount, the injured party must produce the best evidence available; if that evidence sufficiently provides a reasonable basis for determining his loss, his recovery is not to be denied because he cannot ascertain the exact amount of damages."). But to recover all of its claimed damages on summary judgment, Signet must prove them so thoroughly that no reasonable jury could reject its proposal.

27

*See Celotex Corp.*, 477 U.S. at 323 (explaining that the moving party must demonstrate that no genuine dispute of fact exists). It has not done so. Signet's damages depend on a forecast of costs that it would have spent, but did not, performing the contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 347(c). These projections are estimates; nothing more. For example, some performance costs are unaccounted for, and Signet's motion lacks evidence on whether its labor costs are fixed or variable. *See Marine Transp. Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1141 (5th Cir. 1994) (only "[v]ariable costs are deducted from the charter rate"). The court does not have the degree of confidence that Signet is entitled to $995,750 in damages necessary to award that amount on this summary judgment record.

For these reasons, Signet's motion for an alternative partial summary judgment, (Docket Entry No. 29), is denied.

## IV.     Conclusion

The court denies both Signet's renewed motion for partial summary judgment on liability, (Docket Entry No. 21), and International Shipbreaking's cross-motion, (Docket Entry No. 23). The court denies both International Shipbreaking's motion for partial summary judgment on damages, (Docket Entry No. 28), and Signet's cross-motion, (Docket Entry No. 29).

SIGNED on March 5, 2026, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge